# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

  **v.**                                        **Case No. 18-CR-143**

**WAHEBA DAIS**
       **Defendant.**

## STATEMENT OF REASONS MEMORANDUM

Defendant Waheba Dais pleaded guilty to attempting to provide material support or resources to a foreign terrorist organization, contrary to 18 U.S.C. § 2339B(a)(1). The case was unlike other material support cases prosecuted in this district and cited by the parties in their submissions, which involved defendants who either provided/solicited funds for terrorist groups or who traveled seeking to offer themselves up as supporters of the terrorist group. This defendant engaged in an array of online activity, which included providing advice on how to make explosive devices and poison, prepare for an attack, and select targets. Fortunately, she was discovered before anyone she inspired and assisted actually completed an attack; nevertheless, her actions did place the community in danger.

Stressing the seriousness of the offense, the government sought a sentence of 20 years in prison, the statutory maximum, followed by life on supervised release. Citing her mental health issues and history of abuse, defendant asked for a sentence of time served (a little over two years). Determining an appropriate sentence was challenging, given the unhelpfulness of the sentencing guidelines in terrorism cases and the absence of comparable cases. For the reasons that follow and those stated on the record at the sentencing hearing, I imposed a

sentence of 90 months in prison followed by three years of supervised release.

## I. SENTENCING PROCEDURE

When sentencing a defendant, the district court begins by calculating the advisory guideline range, and then it applies the sentencing factors set out in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence. United States v. Patel, 921 F.3d 663, 670 (7th Cir. 2019). "After United States v. Booker, 543 U.S. 220 (2005), a sentencing judge has the discretion to disagree with a particular provision of the guidelines and to impose a non-guidelines sentence that, in his or her judgment, is more consistent with the statutory sentencing factors set out in section 3553(a)." United States v. Griffith, 913 F.3d 683, 688 (7th Cir. 2019).

## II. GUIDELINES

The base offense level for a violation of 18 U.S.C. § 2339B is 26. U.S.S.G. § 2M5.3(a). The guideline further provides for a 2-level enhancement if the offense involved the provision of dangerous weapons or funds used to purchase such weapons. U.S.S.G. § 2M5.3(b). Finally, the guideline provides cross references to the murder guidelines if the offense resulted in death, § 2M5.3(c)(1), the attempted murder guideline if the offense was tantamount to that offense, § 2M5.3(c)(2), and the weapons of mass destruction guideline if the offense involved the provision of such materials, § 2M5.3(c)(3). The guideline thus links the offense level to the nature of the assistance provided and the extent of any harm caused by the offense.

However, U.S.S.G. § 3A1.4, the "terrorism" guideline, trumps this carefully calibrated approach. Under § 3A1.4(a), if the offense involved a federal crime of terrorism, the offense level is automatically increased by 12 levels (and if the resulting level is less than 32, increased to level 32). Further, under § 3A1.4(b), in each such case, the defendant's criminal history

2

category is deemed to be category VI. This means that a defendant in a § 2339B case will usually face a range well in excess of the statutory maximum of 20 years, regardless of what he specifically did and regardless of whether he has no prior record or a terrible one. This case was an example: although defendant's offense involved none of the aggravating circumstances set forth in U.S.S.G. § 2M5.3, and despite the fact that she had no prior criminal history, she ended up with an advisory guideline range of 292-365 months, which defaulted to 240 months under U.S.S.G. § 5G1.1(a).

In this sense, U.S.S.G. § 3A1.4 resembles the child pornography guideline, U.S.S.G. § 2G2.2, which has been roundly criticized by the courts, in that it recommends sentences near or above the statutory maximum even in mine run cases. This is contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous. See United States v. Dorvee, 616 F.3d 174, 186-87 (2d Cir. 2010).

It is also contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record. As Judge Breyer has noted, the terrorism enhancement "takes a wrecking ball" to this construct. See United States v. Alhaggagi, 372 F. Supp. 3d 1005, 1013 (N.D. Cal. 2019). Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided. Id. at 1014. Further, as Judge Kane has noted, material support cases can involve a wide range of conduct, yet § 3A1.4 frequently results in guideline ranges that equal or exceed the maximum statutory sentence, without differentiating between various levels of conduct. See United States v.

3

Jumaev, No. 12-cr-00033, 2018 U.S. Dist. LEXIS 119916, at *28-29 (D. Colo. July 18, 2018). Finally, as both Judges have noted, this guideline was enacted pursuant to a congressional directive and absent empirical evidence. See Alhaggagi, 372 F. Supp. 3d at 1014-15. Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role, see Kimbrough v. United States, 552 U.S. 85, 109 (2007), and are generally entitled to less respect. See United States v. Reyes-Hernandez, 624 F.3d 405, 418 (7th Cir. 2010).

Accordingly, the guidelines provided limited guidance in this case.

### III. SECTION 3553(a)

In imposing sentence, the court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the needs of the public and any victims, the sentencing guidelines and policy statements, and the avoidance of unwarranted disparity. 18 U.S.C. § 3553(a). The court must then impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation of the defendant. Id.

As fully detailed in the pre-sentence report ("PSR"), beginning by at least 2017, defendant used multiple social media platforms and hacked social media accounts to promote ISIS ideology, recruit adherents to ISIS, collect information on how to make explosives and biological weapons and on how to conduct terrorist attacks, and distribute that information to individuals interested in conducting attacks on behalf of ISIS. She did this knowing that ISIS was a terrorist organization and had engaged in terrorist activity.

In order to support ISIS, defendant repeatedly hacked into Facebook accounts, taking them over from unwitting victims and changing the profile picture, friends list, and display name,

4

typically choosing a new display name that was a variant of "Hind Salah Eddin." She pledged her allegiance to ISIS on numerous occasions and engaged in Facebook conversations with others in which she proclaimed her loyalty to ISIS. During one such conversation, she stated that she wanted to leave America for Syria, via Turkey, but that if she tried to leave, she would be arrested for "conspiracy to join."

Defendant also used social media on multiple occasions to promote ISIS and its terrorist agenda and to attempt to recruit others to join ISIS and to commit attacks on its behalf. One such message encouraged ISIS supporters who could not travel to ISIS controlled areas to conduct terrorist attacks in the countries where they reside. Defendant had specific communications with Facebook user "OG" about an attack that OG was planning. OG indicated that he was a 25-year-old Algerian and was planning an attack in France.

Most disturbingly, defendant distributed information about explosives and biological weapons on Facebook and other social media platforms, in the form of videos and conversations about bomb-making and biological weapons materials, for use by people who want to commit violent acts in the name of ISIS. FBI experts analyzed one such video and determined that it demonstrates a viable method of preparing TNT.

During communications with an undercover FBI employee ("UCE"), defendant suggested potential targets for attacks, such as street festivals and celebrations in the summer, or churches. She also advised that the attack should be something that would devastate and kill more than one person. She said, "Learn how to make bombs and explosive belts as a preparation process. They've been talking about this for months." After the UCE said he had no experience making weapons or explosives, defendant responded, "No problem, making bombs is easy, and you can also start with poisons. I have a [social media] Channel you may

5

benefit from." She further said, "I advise you to use poisons first," and she again recommended her channel as a place to find an encyclopedia of poisons. She said the easiest poison to make is Ricin, which she claimed is very effective. They also discussed the Boston Marathon bombing, with defendant stating,"It was very easy to make. All it needs is a pressure cooker, shrapnel and explosives. Join my channel and research." They further discussed the recipe for Ricin.

During subsequent communications, defendant provided the UCE a new link to a social media channel directed to "lone wolves" who are making poisons, explosives, weapons, and silencers. The UCE also told defendant that he had downloaded the Ricin file from defendant's social media channel, and defendant said, "Good. May Allah make you successful. It's easy to make but remember to be cautious." In discussing potential targets, defendant suggested a government post or water reservoirs.

These specific communications were not just with the UCE. For instance, on or about May 11, 2018, defendant communicated with Facebook user "EAR," who told her, "I am in need of a way to build explosives by using agricultural fertilizer." Defendant replied, "Participate in my channel about explosives," and then provided a link to a channel that provided "[l]essons in manufacturing of explosives and everything regarding Lone Wolves." EAR said that he would like to "build a bomb that can uproot a whole house. I am confused on which one to pick, and don't know how to formulate in grams of explosives and how to make it powerful." Defendant advised EAR that he needed to "start with a small amount, meaning don't make the whole thing at once. You have to experiment with small quantities and then make it bigger."

Defendant was arrested on June 13, 2018. During an interview with federal agents, she admitted to engaging in extensive online activity in support of ISIS. She said she had begun

6

one-and-a-half to two years before because she was "bored." She supported ISIS as part of an online community of people who speak Arabic and who liked her. She admitted to posting a Ricin recipe and instructional explosives videos that she obtained from "experts." She also admitted to hacking Facebook accounts and teaching others how to hack.

In her statement to the PSR writer, defendant indicated that this conduct occurred during a low period in her life. She spent untold hours in front of a computer screen on various social media platforms chatting with people she had never met, sometimes connecting one person with another, and uploading and organizing content. She was lonely, depressed, and spent little time contemplating the potential consequences of her actions. She convinced herself that none of the men she communicated with would ever follow through with anything because most of them appeared interested only in flirting, sexual banter, and trying to impress her and others. She recognized her conduct was, at best, extremely reckless, and was grateful that no one appears to have acted maliciously, to the detriment of others, in response to her online "advice." She indicated that she has no desire to engage in violence, promote violence, or to contribute to the indiscriminate violence of organizations such as ISIS. She further indicated that, where previously she had eschewed medication to address mental health problems, she now sought such help.

It was difficult to know how much of this defendant actually "meant." The offense conduct did stand in contrast to her background. She was 48 years old, with no prior record and no previous indication of radical ties or conduct. Born in Jerusalem, she came to the United States legally in 1992 and became a permanent legal resident, living here for more than 20 years before getting involved in this offense, which appeared to have come as a shock to her family. She faced removal from the United States based on this conviction.

7

Defendant has been married twice. The first marriage, arranged by her family, lasted from 1991 to 2003, and produced four children, now adults. Defendant indicated that her first husband was physically abusive, and she only married him because it was required by her family. She then began another relationship, which produced three more children, ages fourteen, thirteen, and six. That relationship ended when the man's wife returned from the middle east. These minor children now lived with their father. Defendant stated he was never violent, but he was emotionally controlling.

The PSR indicated that child protective services were involved with defendant's family several times from 2006 to 2018. After defendant's arrest in June 2018, the home was found to be uninhabitable: dirty, bed bugs, no food.

One of defendant's adult daughters described defendant to the PSR writer as a selfless, kind, gentle woman who would never hurt anybody. Regarding this offense, she suspected her mother wanted to belong to something and also wanted a distraction from the problems in her life. Another adult daughter described defendant as an extremely caring person who had always been active in her life. She did not know why defendant was involved in this offense, but noted defendant had been showing signs of depression for some time before her arrest.

The defense presented letters from three of defendant's adult children and her sister. Defendant's son indicated that she was lonely and bored. He also indicated that she had been oppressed her whole life, and that is what led to this. He further discussed her rough upbringing in Jerusalem and her abusive husbands. Despite everything she had been through, she was an amazing mom, he wrote. One daughter wrote that defendant wanted a sense of belonging in a world that had been very unforgiving to her. Since being detained, she committed to working on her mental health issues. Another daughter wrote that defendant did

8

her best to keep them happy and safe. Defendant's sister discussed defendant's psychological condition, which may have led her to unbalanced decisions. She described defendant as a caring, sweet person, who never thought of harming anyone.

The PSR discussed defendant's mental health issues, and defense counsel provided a detailed psychological report. Defendant reported feeling significantly depressed from 2012 to 2018 but did not address her problems. She had been prescribed medication in the jail after her detention in this case, which seemed to have helped.

Defendant graduated high school in Jerusalem and completed one year of college in the United States in 2011. She seemed to be an intelligent person, with significant computer skills.

As indicated above, the guidelines recommended the statutory maximum, but I found the guidelines unhelpful here. In its sentencing memorandum, the government listed a number of cases in which defendants in material support cases received maximum sentences, but those cases did not seem comparable to this one, as those individuals attempted to travel to join ISIS.

Comparisons and guidelines aside, I agreed with the government that this was a very serious offense. Defendant pledged her allegiance to ISIS on numerous occasions, at a time when that organization was engaging in horrific conduct. Defendant was, for at least a year, a prolific online promoter of ISIS and a source of information on how to commit terrorist attacks. As indicated in the report from Dr. Lorenzo Vidino, submitted by the government, such online propaganda is a vital part of ISIS's recruitment and radicalization strategy. Based on a review of her communications, Dr. Vidino indicated that defendant was not just a sympathizer or passive follower but an active recruiter who groomed others, connected people to others she claimed to know, and acted as a "devil on the shoulder" encouraging so-called lone wolves.

She had many followers and was a fairly sophisticated writer.

As the government further noted, defendant was also an accomplished hacker and identity thief. She taught others how to hack and posted a video of her hacking technique. In addition to hacked Facebook accounts, defendant maintained private channels on Telegram, an encrypted social media platform, on which she compiled detailed information about explosives, poisons, and other means of committing attacks. She shared links to these channels with followers who wanted information about how to commit attacks.

As the government indicated, defendant basically maintained an encyclopedia of lone wolf tactics. And, her specific communications were not limited to the undercover FBI employee, but included others, ostensibly actual radicals, as discussed in the PSR and in the government's memorandum.

There was no evidence that any of defendant's followers successfully completed a terrorist attack based on her information, although the government indicated one of her Facebook followers was arrested in Pennsylvania after law enforcement thwarted his plan to bomb a worship center in Pittsburgh. In sum, defendant engaged in dangerous conduct, whether she actually intended anyone to act or not.

There really was no dispute about what defendant did; the key issue for sentencing purposes was why. Defendant indicated that she was bored and lonely, and convinced herself none of the people she communicated with would actually do anything.

The government responded that given her apparent dedication, and the volume of her posts, it was hard to square her conduct with boredom or fooling around. Quoting from her posts, the government argued that she was intelligent, deliberate, and dedicated to supporting ISIS by facilitating lone wolf attacks.

10

I carefully reviewed the psychological report from Dr. Darold Hanusa for its insight into why defendant may have engaged in this behavior. Dr. Hanusa performed detailed testing, noting severe depression and PTSD symptoms linked to abuse over the course of her lifetime. She displayed a strong tendency to present herself in a way that attempts to gain a favorable impression on others, consistent with profiles of battered women. She also endorsed obsessive-compulsive symptoms. On testing for the presence of psychopathy, while she did endorse questions which evidence pathological lying, manipulation and conning, and impulsivity, along with some need for stimulation/proneness to boredom, and lack of empathy, her overall score placed her in the non-psychopath group. Another test placed her in the low risk/need category.

Dr. Hanusa acknowledged that this was not a domestic violence case, and no claim was being made that her actions were directly related to any domestic violence she experienced. However, based on testing, her scores indicated significant trauma. Dr. Hanusa stated: "The importance of this data is that [defendant's] behaviors and conduct have been impacted by that trauma which has in turn impact[ed] her personality, emotional stability, and decision making. This is a difficult case, with many layers of complexity, as is reflected in the results of the psychometric tests utilized here." (Report [R. 44-1] at 14.)

Dr. Hanusa diagnosed PTSD, major depression, obsessive-compulsive disorder, and generalized anxiety disorder. In his conclusions, Dr. Hanusa indicated that defendant's high levels of OCD symptoms suggest that she may have issues with impulsivity along with risky decision-making and biased probabilistic reasoning. Due to her lifetime trauma experiences, she seemed to have limited capacity for self-control but rather impulsively engaged in rewarding behaviors resulting in risky decision making. He also suggested that her fear of loneliness and

11

lack of social connection led her to engage in self-destructive and criminal behavior. He indicated that dysregulated lonely individuals struggle to make themselves feel better, which appeared to be the case here. Dr. Hanusa concluded that rather than prison it was recommended that defendant be given an outcome that would allow her to be maintained in the community adhering to a plan that includes psychotherapy and intensive community supervision.

I did not see a need for a sentence at the statutory maximum in this case. Such sentences should be reserved for the worst offenders, and it was hard to see how this defendant fell in that category. She provided information only, not actual weapons or funds for weapons, and there was no proof anyone used her information to carry out an actual attack. She also had no prior record. Given her age and lack of prior record, the research would suggest that she poses a low risk of re-offending. See U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, at 25 (Dec. 2017). The doctor's testing suggested the same.

While I did not accept defendant's history of abuse and mental health issues as an excuse for her conduct, I could not ignore this evidence. With mental health treatment, she will hopefully be able to overcome the pathologies that caused her to seek this kind of attention. Given her history and the statements of her family, I did not see her as a hardened jihadist who could not be reformed and thus must be separated from the public for most of the rest of her life.

On the other hand, I did not see this as a case where a community based sentence would be sufficient. The conduct here was incredibly dangerous, and it went on for an extended period of time. Even if she was motivated by the desire for attention rather than

12

maliciousness, the need to promote respect for the law and to deter others required a significant prison sentence.

Under all the circumstances, I found a sentence of 90 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence sought to balance the extreme danger defendant created through her conduct with the mental health issues that surely contributed to her actions. It represented a substantial penalty, sufficient to promote respect for the law and deter others, while acknowledging that defendant did not pose a danger requiring she be confined for most of the rest of her life. The sentence was based on the § 3553(a) factors and would have been the same regardless of the guidelines.

I further ordered defendant to serve three years of supervised release, a term sufficient to ensure monitoring for further criminal activity and needed treatment. The statute permits supervision up to life in terrorism cases, 18 U.S.C. § 3583(j), but that was not necessary here. First, defendant will likely be removed after serving her prison sentence and thus not available for active supervision. Second, given the absence of any prior record, I did not see her as posing the degree of risk that would call for supervision of that length, particularly after serving the prison sentence; this term also sufficed to address her mental health needs. I did agree with the government that a computer monitoring condition was warranted, given the nature of the offense, which involved hacking and extensive online activity, and the need to monitor her computer use for public protection and to deter further activity of the sort involved in this case. A monitoring condition, as opposed to a limitation or ban on computer use, involved no greater deprivation of liberty than reasonably necessary for the purposes in 18 U.S.C. § 3553(a)(2)(B) &(C). Other conditions appear in the judgment.

13

Dated at Milwaukee, Wisconsin, this 27th day of August, 2020.

           s/ Lynn Adelman
           LYNN ADELMAN
           District Judge