UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

UNITED STATES OF AMERICA,       )
                            )
             Plaintiff,    )
                            )    Case No. CR 18-143
    vs.                   )    Milwaukee, Wisconsin
                            )
WAHEBA ISSA DAIS,          )    August 24, 2020
                            )    1:50 P.M.
             Defendant.    )

------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:         Office of the US Attorney
                            By: GREGORY J. HAANSTAD
                            517 E Wisconsin Ave - Rm 530
                            Milwaukee, WI 53202
                            Ph: 414-297-4581
                            Fax: 414-297-1738
                            gregory.haanstad@usdoj.gov
For the Defendant
WAHEBA ISSA DAIS:         Federal Defender Services of
(Present)                  Wisconsin, Inc.
                              By: JOHN W. CAMPION
                            517 E Wisconsin Ave - Rm 182
                            Milwaukee, WI 53202
                            Ph: 414-221-9900
                            Fax: 414-221-9901
                            john_camption@fd.org

U.S. Probation Office:     DANIEL DRAGOLOVICH 414-297-1955


U.S. Official Reporter:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:        WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

P R O C E E D I N G S

**(Call to Order of the Court at 1:51 p.m.)**

THE COURT:  This is U.S. vs., is it Dais?

MR. CAMPION:  Dais.

THE COURT:  Dais, 18-CR-143.  Appearances, please?

MR. HAANSTAD:  Good afternoon, Your Honor.  Greg Haanstad for the United States.

PROBATION OFFICER:  Daniel Dragolovich with U.S. Probation.

MR. CAMPION:  Waheba Dais appears in person with counsel, John Campion.  Good afternoon.

THE COURT:  Let me just -- people, when you're talking to the court you don't have to wear your mask.  I understand that sometimes it makes it hard to talk.

So, the first thing, Mr. Campion, I understand you apologized for your late sentencing memo, but it really is an inconvenience to us when you do that.  So I just want to caution you in the future as best as possible to try to get it in on time.

So, have you gone over -- Mr. Campion, have you gone over the presentence with your client?

MR. CAMPION:  I have.

THE COURT:  Any objections?

MR. CAMPION:  No.

THE COURT:  You waive full reading of supervision

1       conditions?

2                   MR. CAMPION:  Yes.

3                   THE COURT:  Government, any objections?

4                   MR. HAANSTAD:  No, Your Honor.

01:52   5           THE COURT:  Okay.

6                   As the government notes in its memo, the statutory

7       maximum for supervised release is, pursuant to 18 U.S.C. §

8       3583(j), is life.  Otherwise I'll adopt the facts in the PSR.

9       The guidelines are:

01:53   10                  Level 35;

11                  criminal history VI;

12                  240 months range;

13                  1 to 3 years supervised release;

14                  40,000 to 250,000 fine;

01:53   15                  $100 assessment.

16                  And if we're ready to proceed to sentence,

17      Mr. Campion, I'll hear from you and/or your client.

18                  MR. CAMPION:  Thank you.  And, Your Honor, I realize

19      it does nothing to mitigate it, I am sorry.

20                  THE COURT:  Okay.

21                  MR. CAMPION:  I worked like -- I worked a lot on this.

22                  THE COURT:  I know.

23                  MR. CAMPION:  It was hard to put together.

24                  All right.  Waheba Dais was a woman with promise.  She

01:53   25      knew she was intelligent, she loved school and did well, and had

3

1    goals including going to a better high school and then going to

2    college.

3         But she grew to learn that those goals were

4    incompatible with her culture, with what her family wanted and

5    didn't want for her.  So instead of continuing college, her

6    father made her marry her first cousin, Ibrahim.  That was the

7    first of a series of crushing disappointments in her life that

8    played a role here.

9         Later on in life as an adult, she learned that maybe

10   she still could be something.  She went to school at Kaplan

11   University.  She said she did well.  Kaplan didn't comply with

12   the request for records.

13        THE COURT:  What university?

14        MR. CAMPION:  Kaplan.

15        THE COURT:  Okay.

16        MR. CAMPION:  And she even got a job there and really

17   liked it.  And did some volunteer work.  Until her husband

18   objected.  So she pulled out.  That was what she did, that was

19   what she knew.  Your husband objects, you pull out.

20        She had young children and needed his help so she had

21   to return to this traditional role.  Yet he was never a husband

22   to her.  It was, as I described in my memorandum, a concubinage,

23   and made more clear in Dr. Hanusa's psychological evaluation.

24        Years later her dad died.  And then years later after

25   that she eventually, after basically clawing the money out of

1  her sisters, received her inheritance money.  And I think it was

2  in 2013 she actually made a down payment on the house that she

3  was ultimately arrested in at 3441 East Cudahy Avenue.  For

4  once, at least in the beginning, she had all of her kids under

01:55  5  one roof and it was a high point for her.

6        But it was immediately difficult times.  For good

7  reason, her older kids had a great deal of emotional baggage

8  from the previous years, particularly her son Issa.  There were

9  deep feelings of abandonment earlier, as I laid out in my memo.

01:55  10       So rebelling against her, destroying the home in part,

11  eating all the food was part of the response.  Her money dried

12  up.  Her house fell into disrepair.  There was a terrible sewage

13  problem.  The agents who made the arrest described in terrible

14  detail what they saw.  And it's part of the reports from Child

01:56  15  Protective Services that went to the Court -- that went to the

16  probation office which they have.

17        All the while she was not effectively addressing her

18  own significant mental health issues, borne of her early years

19  of familial nullification, the terrible trauma and isolation

01:56  20  brought upon her by her husbands which left her utterly lonely.

21        And add to this desperate mix her affinity for and

22  facility with computers and subsequently social media and

23  essentially the pursuit of herself in these dark hours.

24        This background, these mental illness issues, the

01:57  25  alienation and isolation, the loneliness, these themes are

1   strikingly common in people drawn to ISIS and their propaganda,

2   according to a report from the Center on National Security at

3   Fordham Law School.  Many of those accused of trying to join

4   ISIS "had expressed some form of social alienation, loneliness

5   or identity issues."

6         A study of those drawn to extremist ideologies

7   conducted by researchers at Georgetown noted that such people

8   "are likely to suffer from some psychological disturbance,

9   increasing the likelihood of extremist ideologies."

10         The report further noted:  "An individual who has

11   suffered trauma may disassociate himself or herself from her

12   identity and seek alternative world views to replace this loss.

13   These new extreme ideologies are frequently grounded in a

14   religion that gives meaning to pain, provides a community and

15   sense of self and others a system of behavior and identity

16   particularly appealing to psychologically traumatized people."

17         I say that because I think that fits Ms. Dais's

18   situation very well.

19         With regard to the material supplied to the Court by

20   the government, I would say, and I don't mean to sound

21   sarcastic, there was no surprise that the government recommends

22   a maximum sentence.  Driven by the guidelines perhaps, this

23   appears to simply be the government's reflexive response to

24   these type of cases.

25         Ms. Dais's case warrants nothing of the kind.  As to

1    why she would engage in this online conduct, the government

2    notes, quoting from the memorandum, "Dais indicated that she

3    supported ISIS because she was bored and suggested she was not

4    serious about what she was doing.  The overwhelming volume of

5    Dais's online postings and communications and their level of

6    detail concerning how to commit attacks belies that suggestion.

7    Dais was online day and night working tirelessly to gather and

8    disseminate pro ISIS information and generating her own

9    persuasively written content."

10            That's from the government's memorandum.

11            Dais -- Waheba Dais said to the agents in the hours

12   after her arrest that -- she used the word "bored."  Loneliness,

13   isolation, alienation would have been more accurate at that

14   time.

15            The government actually -- what I just read there

16   actually highlights a key aspect of Waheba Dais's conduct as

17   Dr. Hanusa wrote about.  Quoting from Dr. Hanusa's report:

18            "This dynamic is important in this case.  It moves

19   beyond a simple explanation for Waheba's professed need for male

20   attention to include scientific evidence for increased

21   impulsivity, risky decision-making, and reward system

22   dysfunction in individuals with extreme OCD."

23            I failed to say that when I said this dynamic, he's

24   talking about her extreme OCD.

25            I'm going to talk briefly about Dr. Vidino's report.

7

1    It's an 18-page report that I think stem from several of his

2    sources.  The first 16 pages talk about ISIS and the

3    *ISIS-related mobilization in America,* as he calls it, and then

4    also the role in western culture, particularly America, of women

02:00    5    in ISIS.  In the final two pages he summarizes what he learned

6    about Ms. Dais.

7            Dr. Vidino's paper argues -- excuse me.  He talks

8    about the utility of western women of ISIS.  He writes:

9            "Their roles unveil a considerable range of engagement

02:01    10   though the metric for their varied contributions must be

11   adjusted when evaluating the extent and significance of their

12   involvement.  Western women act as wives and mothers as well as

13   propaganda disseminators, online recruiters and fundraisers,

14   they do not fight like their male counterparts."

02:01    15           That's at page 16.

16           So Dr. Vidino's paper argues that while women who seek

17   to assist ISIS and do make contributions, these contributions

18   are at a lower level and cannot be as significant as men who can

19   fight and try to fight or do fight.  That opinion undermines the

02:02    20   government's use of their own four cases in their memorandum at

21   14 and 15.  This is the *Abdella Tounisi* -- I'm not going to

22   pronounce these names.  The Court has these cases at page 14 and

23   15.  There are four cases and five defendants.

24           All of these individuals, all male, made plans to

02:02    25   travel to Turkey or elsewhere in the Middle East, and all

8

 1  purchased airline tickets to do so, to become fighters.  Three

 2  of them were arrested at the airport heading to their flights.

 3  Their actions, by Dr. Vidino's argument, were at a higher level

 4  than Waheba Dais's.

 5          And in a previous sentencing argument from the

 6  government in *United States vs. Jason Luedke*, the government

 7  argued:  "Volunteering oneself to a foreign terrorist

 8  organization is arguably the most dangerous form of material

 9  support."

10          THE COURT:  Just let me ask you this and maybe the

11  government, too.  All the cases about -- that deal with this

12  issue -- maybe not all of them, but most of them seem to be

13  these people that want to get on the airplane and fly to Turkey

14  and help ISIS in that way.  I haven't been able to find any

15  cases that are sort of like a woman going on the internet and

16  talking to people.  I mean, are there any cases?  Have you found

17  any?

18          MR. CAMPION:  If the Court's referring to me --

19          THE COURT:  I'm talking to you, Mr. Campion, but I

20  guess I -- if you found them I assume Mr. Haanstad found them,

21  too.

22          MR. HAANSTAD:  I'm not aware of any cases that involve

23  that specific type of defendant.  I think it's more a matter of

24  examining the conduct that was at issue in those cases,

25  comparing it to this one.

1          THE COURT:  All those cases are different than this

2     case.

3          MR. HAANSTAD:  Yeah.

4          THE COURT:  This case is sort of -- I haven't seen any

02:03   5     like this exactly.  And I guess I'm just pointing that out.

6     But, go ahead, I don't mean to interrupt you.

7          MR. CAMPION:  So, going back to Dr. Vidino's paper, he

8     talks about what Waheba Dais did do.  That -- this is his words:

9     "That she was constantly engaging with several interlocutors

02:04   10    online."  That would be my take.

11         Nothing -- he wrote, "Nothing demonstrates this more

12    than the fact that 17 of her online friends pledged allegiance

13    to ISIS in response to one of her posts."

14         When he says "nothing demonstrates," he's talking her

02:04   15    persuasiveness.

16         "Nothing demonstrates her persuasiveness more than

17    that 17 of her online friends pledged allegiance to ISIS in

18    response to one of her posts."

19         Well, these are also people who are looking at her

02:04   20    posts.  There is no indication from either Dr. Vidino nor the

21    government, no one claims that these were new adherents to ISIS

22    or that Waheba Dais had converted them.  It is, in his own

23    words, an "echo chamber."  And the fact that 17 people agreed I

24    don't think is terribly shocking or surprising or indicative of

02:05   25    anything.

1        He also points out and thought this was important,

2   that she said that -- she said to her -- and it's in the plea

3   agreement, it's in the presentence report, this communication

4   that Waheba Dais had with someone named AK.

02:05   5        "She said to her contact AK that she knew the ISIS

6   military trainer in Raqqa, which was then the capital of the

7   self-proclaimed Caliphate."

8        And then he wrote:  "Having this kind of connection is

9   not very common among United States ISIS sympathizers and is,

02:05   10  therefore, a crucially important feature that sets her apart

11  from most of her peers."

12       Yet nothing that I've seen or been made aware of

13  demonstrates that she was speaking the truth here; that she

14  actually did talk to an ISIS military trainer.

02:05   15       Further, it runs contrary to what Dr. Vidino wrote

16  about -- in his paper about women in ISIS, that "fighting is not

17  among women's roles.  Maybe it will be in the future," he

18  writes, "but that it's not."

19       Waheba Dais maintains that she made that up and

02:06   20  nothing demonstrates that she did not make that up.

21       Dr. Vidino -- I don't know if it's Vidino or Vidino.

22  Vidino I'm going to go with.  Dr. Vidino also quotes from former

23  FBI director Comey.  And he gave I guess an interview to the

24  Huffington Post in July of 2019, and he's talking about what is

02:06   25  different now.

11

1    It's, you know -- he talks about how ISIS or terrorism

2    isn't your grandfather's terrorism, or something like that.  And

3    he writes about -- he talks about one aspect of it.  And I'm

4    going to argue about -- I'm going to talk about this aspect

02:06    5    applying to so many things in our current life.

6    He writes, "All that propaganda is in your pocket."

7    In the form of a cell phone he's talking.  "And the terrorist is

8    in your pocket.  You could have direct communication with a

9    terrorist in Syria all day and night.  And so the effect of

02:07    10    that, especially on troubled minds in kids — it works!  It's

11    buzz, buzz, buzz, buzz, buzz.  It's the constant feed, the

12    constant touching, so it's very, very different and much more

13    effective at radicalizing than your grandfather's al Qaeda

14    model."

02:07    15    I think what he's also touching upon is he's talking

16    about part of our western culture and our free speech and our --

17    the lack of limits that other societies have that we don't.

18    There are downsides obviously.  There are downsides in terms of

19    what the internet offers.  Internet is incredible.  It offers,

02:07    20    you know, all kinds of communications.  It's been helpful

21    towards so many things, and yet it has a dark side as noted

22    partly in Dr. Vidino's report.  And I think the government also

23    mentions it: child pornography and the dissemination of that.

24    But also just things like, you know, well beyond

02:08    25    simply Islamist terrorism:  right-wing terrorism in this

12

1   country, some left-wing terrorism in this country are spurred on

2   by this; government -- crazy conspiracies involving the

3   government.  All of that is part of the downside of this, part

4   of the speech.

5           Now, what Ms. Dais did broke laws, undoubtedly.  She

6   pleaded guilty to this.  And the source of why she did that, you

7   know, it's hard to piece these things together.  But we have

8   some pretty good pieces of this puzzle.  This trajectory of her

9   life combined with her own talents, combined with the utter

10  misery she had known, the trauma, the alienation, the perception

11  changes that trauma causes, that this seemed like a good idea.

12  It wasn't.  It was terribly dangerous.  It was -- you know, I

13  called it at least reckless.  The government actively calls it

14  very dangerous.

15          And Ms. Dais knows that.  She knows that -- you know,

16  we don't know -- we can't say what all people did with this

17  information.  We don't know of anything that somebody did that

18  was -- that caused actual harm to people, which we're very

19  thankful for.  Maybe it was very persuasive for some people.

20  But in some ways it's hard to measure.  The bottom line is, you

21  know, she pled guilty to it because she was guilty and she is.

22          Now, with regard to the sentence, the Court obviously

23  knows what we're asking for.  And I acknowledge, it's a lot.  We

24  asked for her to be -- she wouldn't be released.  We asked for

25  her to take into account this two-plus years she's had mostly at

1    Waukesha, which I am a witness to as how miserable it was for

2    her.  As bad as it is -- jail is, you know, lousy -- some jails

3    are worse than others.  I think the marshals will probably tell

4    you that this particular jail is difficult, especially for

02:10    5    women.  And she was utterly alienated at Waukesha.  So, I mean,

6    maybe she's got it coming to her.  Some folks might think that,

7    which is fine.  But it was awful.

8         One of the good things about the jail has been that

9    for the first time in her life she's being medicated now.

02:10    10    Actual medicine that she takes for which she had her own

11    barriers between accepting western medication.  Her own stigmas.

12    *I can't take medicine, it's against my religion.*  Her inability

13    to access healthcare very well.  Her husband's stigma about it.

14    Didn't want that to happen.  Transportation issues.

02:10    15         She actually did try to get into therapy on a number

16    of occasions in the 2000s.  And that's part of the records that

17    Dr. Hanusa reviewed with the reams of reports that our office

18    sought and obtained from various record providers.

19         So getting back to this time-served thing, I think

02:11    20    it's -- it is sufficient to punish her --

21         THE COURT:  That's what you're requesting is a

22    time-served sentence, correct?

23         MR. CAMPION:  Yes, sir.

24         THE COURT:  Okay.  Go ahead.

02:11    25         MR. CAMPION:  The punishment -- I mean, it's probably

1    longer than her activity lasted, but it was also significant

2    punishment for her.

3          But the most serious punishment, if the Court were to

4    give her five more years, it would pale in comparison to what

02:11  5    happens to her, which is: she gets deported.  It seems obvious

6    that she would be deported, but we wanted to at least, you know,

7    baseball lingo, *run out those ground balls.*  Is there any

8    chance.

9          And we thought we had two things working for a while:

02:11  10   this derivative citizenship either from her father or from --

11   because she was a -- she was here lawfully.  You know, we just

12   had to use an actual litigation attorney to help us out with

13   that.  And, no, it's not going to happen as most everyone would

14   imagine.

02:12  15         THE COURT:  She was here lawfully because she married

16   somebody who was, what, a citizen?

17         MR. CAMPION:  Yes.

18         THE COURT:  But she's not a citizen.

19         MR. CAMPION:  She's not.  Unfortunately.  And I think

02:12  20   that's also a cultural thing.  She never took the initiative to

21   say, you know, I am going to do this for myself.  Regrettably.

22   Very regrettably she did not do that.

23         So she will -- her best fate, and it's likely

24   actually, is when she's done with her sentence she's deported

02:12  25   after some period of time and she goes to Jordan.  She has a

 1    sister that lives there.  So she can -- she does have the

 2    ability to make a new start there.

 3              THE COURT:  What other possibility would there be

 4    besides that?

02:12  5              MR. CAMPION:  Besides going to Jordan?

 6              THE COURT:  Yeah.

 7              MR. CAMPION:  I don't know.  I mean, that's -- she

 8    cannot go to Israel.  She was never an Israeli citizen as we

 9    found out.

02:13 10              Well, I mean -- I forgot one step.  My client just

11    reminded me.  She would fly to Jordan and hopefully be able to

12    move to the West Bank where her sister lives.  I'm sorry, I

13    forgot that step.

14              So it would be -- a plane to Jordan is what I mean.

02:13 15    And then -- because she probably could not fly into say Ben

16    Gurion Airport because of her conviction.  But she plans to

17    eventually arrive at West Bank.

18              THE COURT:  Okay.

19              MR. CAMPION:  So I'm going to say one last -- just a

02:13 20    couple last things I've got.

21              So these -- there is the James Comey quote,

22    interesting anyway, comes from an article called, "The FBI" --

23    "If you try to join ISIS through Twitter, the FBI probably knows

24    about it."  That's the title of the Huffington Post post.

02:13 25              I think that's kind of interesting, is because I think

1    that's indicative of what happened here.  The FBI was

2    essentially on to her and began monitoring her in early January

3    of 2018, and by the end of the month had one of their employees

4    talking with her and, you know, keeping a finger on the pulse, I

5    guess.

6           When the -- when Dr. Vidino talks about engaging with

7    several interlocutors, I think he's saying that quite literally.

8    There weren't that many that were actively asking for

9    significant advice.

10          Now, I'm not trying to downplay what she did with the

11   FBI's own undercover person.  You know, the things she said were

12   hideous at the time.  And that's why -- partly why we're here.

13   And it's -- if I'm the government, I'm going to cut and paste

14   those to the sentencing memorandum as well.  But there just

15   simply were not that many.

16          So they were monitoring her as of early January and

17   essentially pulled the plug on this thing in the middle of June,

18   about five months later.  For all of her alleged sophistication,

19   she left behind digital evidence at every turn.

20          And one thing that Dr. Vidino's paper talks about is

21   how a lot of people online were -- who become ISIS supporters

22   and whatnot online, they have an avatar.  They have something

23   that resembles something about ISIS or support it somehow,

24   including apparently just even showing a copy of the Detroit

25   Lions' look for some odd reason.

1    Waheba Dais's avatar was a photo that we would all

2  recognize, I believe, of a young blue-eyed Ya Sitti girl who in

3  a moment of misery, on the run ironically from ISIS, is holding

4  her face probably to guard against the sunlight, staring into

02:15  5  the camera, and it is a haunting and mesmerizing look.  And that

6  I think shows how much this was lost on her.  She didn't get

7  that that person was a victim of ISIS.  Made it her avatar.  I

8  just think that's a telling aspect of this case.

9    I would ask the Court to consider those arguments.

02:16  10    Thank you very much.

11    THE COURT:  Your client want to say anything?

12    MR. CAMPION:  Yes.

13    THE DEFENDANT:  Your Honor, I was trying to write

14  something.  If I could just say what I feel.

02:16  15    THE COURT:  Sure.  Get as close to the mic as you can

16  so I can hear.

17    THE DEFENDANT:  Okay.  I'm here today filled with

18  guilt, shame and remorse.  I'm ashamed of my actions and the way

19  it affected the lives of my loved ones, especially my children.

02:16  20  I was blind to the fact and to the truth why I was posting

21  hateful things online and never thought how that might have

22  affected some people.

23    THE COURT:  Can you speak a little slower?

24    THE DEFENDANT:  Sorry.

02:17  25    I was blind to the truth.  While I was posting hateful

1   things online I never thought about how it might have impacted

2   people in the country that I had called home for the last 28

3   years, in which my children were born and still reside.

4            I am thankful that no one got hurt based on my

02:17   5   actions.  The last two years in jail were eye-opening for me and

6   have showed me the errors of my ways.

7            I want to apologize to Your Honor for taking all the

8   resources of this court and for -- I want to apologize to my

9   kids for hurting them by taking their mother out of their lives

02:18   10  and putting them through a lot of pain.  It breaks my heart when

11  I see the sadness I inflicted on them through no fault of their

12  own.

13           I have been suffering from mental illness for years

14  which I left untreated because I was in denial of my illness.

02:18   15  And now I am of a clear mind since being on medications

16  regularly and feel that I am a new person with much better

17  judgment.

18           Your Honor, I wish that you can give me a chance to

19  right my wrongs and to prove to the world that I can be a worthy

02:18   20  human being.  Even getting deported, I'll still be thankful for

21  the opportunity to have spent the last 28 years in this great

22  country and was able to raise my kids here.

23           Again, I want to apologize for not seeing the evil as

24  it was.  I feel like my blindfold has been lifted off my eyes.

02:19   25  And, Your Honor, but I beg for your mercy.  Please give me a

19

1    chance to be a mother again.

2            Thank you.

3            THE COURT:  Thank you.

4            Mr. Haanstad?

02:19  5            MR. HAANSTAD:  Just very briefly, Your Honor.

6            Both parties, including the government, have submitted

7    lengthy sentencing memoranda.  And I don't want to belabor the

8    points in those memoranda, but I just want to touch on a few

9    things.  And, of course, if the Court has any questions I'd be

02:19  10   happy to answer them.

11           Of course, the Court has to consider the factors set

12   forth in Section 3553(a) of Title 18, those being grouped into

13   three general categories:

14           First, the history -- I'm sorry.  First, the nature

02:19  15   and circumstances of the present offense;

16           second, the history and characteristics of the

17   defendant; and

18           third, the need for a sentence to satisfy the goals of

19   the federal sentencing scheme.

02:20  20           First of all, with respect to the nature and

21   circumstances of the offense.  For more than two years the

22   defendant actively promoted and recruited people to join ISIS, a

23   violent hateful terrorist group that seeks to degrade and to

24   murder whole categories of people.

02:20  25           This wasn't just passive participation by the

1    defendant.  She was not just a passive listener in an echo

2    chamber or a re-poster.  She actively hacked accounts, taught

3    others to hack accounts.  Not only recruited people but coached

4    them on how to make explosives, how to prepare and use ricin.

02:20   5    Went so far as to talk about specific target selection to make

6    the most useful -- and by "useful" meaning catastrophic use of

7    ricin.

8           And I think, given the nature of this offense, there's

9    something of a risk of minimizing the conduct involved and in

02:21   10   suggesting that no harm came from that conduct.  In large part,

11   the suggestion might be that because she's not that serious or

12   sophisticated.

13          But first, Dr. Vidino concluded that Ms. Dais was

14   quite sophisticated.  She was intelligent.  She made real

02:21   15   contributions to the area of active ISIS promotion and

16   solicitation of people to join ISIS.

17          Second, any claim that no harm flowed from her conduct

18   is unfounded in light of the fact that at least one Facebook

19   follower, Mustafa Mousab Alowemer, was arrested and charged last

02:21   20   year in a plot to bomb a site in Pennsylvania.

21          And there is to some extent -- the nature of the

22   offense makes it difficult to determine whether or not there are

23   victims.  Ms. Dais was communicating with people using aliases

24   online, which means that we probably can't ever know the full

02:22   25   impact of her conduct.

21

1    Again, briefly with respect to the history and
2    characteristics of the defendant, the government would --
3        THE COURT:  Can you get a little closer to the mic?
4        MR. HAANSTAD:  I'm sorry.
02:22  5        THE COURT:  That's okay.
6        MR. HAANSTAD:  The government would agree that aspects
7    of Ms. Dais's history and characteristics are mitigating.  She
8    has no prior criminal history.  And the PSR and the report by
9    Dr. Hanusa detail very difficult and tragic life circumstances
02:22  10   that involve abuse and neglect.

11       But the government's sentencing recommendation here
12   does take these things into account.  You know, the resolution
13   of this case, the ability to plead to only one count capped her
14   exposure at least in terms of imprisonment.  To be sure, it's a
02:23  15   high cap of 20 years, but it is a cap and it's below what she
16   would have otherwise been exposed to had the case not been
17   resolved along these lines.

18       So the government's position, and again it's set forth
19   in detail and at length in its sentencing memo, is that a
02:23  20   sentence of 20 years is consistent with the purposes of
21   sentencing.

22       Congress and the Sentencing Commission have concluded
23   that supporting a foreign terrorist organization -- even online
24   from home but especially under the circumstances employed by
02:23  25   Ms. Dais -- is a grave offense against the country and must be

1    seriously punished.

2         And again, for those reasons the government is

3    requesting a sentence of 20 years.

4         THE COURT:  Okay, thank you.

02:24    5         Let me take a few minutes.  I'll be back.  Thanks.

6         (Recess taken at 2:24 p.m., until 2:37 p.m.)

7         THE COURT:  All right.  In imposing sentence I

8    consider the 3553(a) factors and then impose a sentence

9    sufficient but not greater than necessary to satisfy the

02:38   10    purposes of sentencing.

11         And we've pretty much talked about what the defendant

12    did.  She attempted to provide support for potential terrorists

13    by giving instructions on how to make explosive devices and

14    poison and how to prepare for an attack.  This was all internet

02:39   15    activity, and fortunately she was discovered before anyone she

16    inspired or assisted actually completed an attack.

17         But nevertheless, her -- the actions really did place

18    the community in danger, you know, and were very, very serious.

19    I mean, it's a -- I mean, that's the hardest argument to

02:39   20    overcome for the defendant, is that this is a very serious

21    offense.

22         There was also hacking into Facebook accounts and

23    taking over Facebook accounts and changing the profile picture

24    and then accessing them from IP addresses that link to her

02:40   25    residence.

23

1       So she obviously had some skills with respect to the

2  computer.  She's obviously intelligent.  It's just unfortunate

3  that she used her skills in such an unproductive and destructive

4  way.

02:40   5       And the kinds of things she talked about on the

6  internet.  Now, I agree it was on the internet.  That's one of

7  the issues in this case.  There's no cases like this that either

8  the parties to the -- the defendant, the prosecutor, or the

9  Court has been able to really uncover.  I mean, most of these

02:41  10  cases involving terrorism seem to be men who want to either

11  attempt to or do fly to the Middle East to -- presumably to

12  fight or to take part in some way.

13      The idea of somebody being on their computer and

14  passing out information, there's not -- there's not cases

02:41  15  talking about that.  So I don't really have much comparable to

16  go on.

17      But it is very serious.  I mean, I don't know how many

18  people are likely to kind of read this kind of stuff on the

19  internet and then take -- participate in activities because of

02:42  20  it.

21      I mean, it would seem to me that somebody who would

22  take advice from somebody who they don't know on the internet

23  and somehow get into doing something destructive as a result of

24  that, I'm sure it's possible and probably it's happened.  It

02:42  25  seems to me that the person who actually did something after

1    listening to this defendant make a communication over the

2    internet, it would probably likely be pretty disturbed

3    themselves.

4            But, the defendant -- apparently the social media

5    channel that was used was directed to lone wolves.  And I'm sure

6    there are people like that out there.  And she did this for a

7    fairly extensive period of time; it was like a year, year and a

8    half to two years.

9            Now, another sort of, I think, difficulty.  I mean,

10   there's no doubt, and I'll talk about this in a second, the

11   defendant really did have a lot of difficulty in her own

12   background: mental health issues; I mean, an oppressive father.

13   And then an arranged marriage where essentially she's told by

14   her father to marry this relative and that's how she comes to

15   Wisconsin.  And the relative is very controlling.  A loveless,

16   physically-abusive marriage.  No income.  No relative, no

17   friends in Milwaukee.  No support from her parents.  And then

18   small children to care for.  Her husband's abusive, begins

19   beating on her after she moved in.  And there's also the -- her

20   husband's involved in sexually abusing her daughter.

21           Finally, she leaves and flees to her parents' house in

22   Staten Island and takes her children there.  But that further

23   alienates her father.  So then she winds up sending her children

24   back to Milwaukee.  And then she comes back here and gets into

25   another marriage which is also not -- she's very controlled.

25

1    So there's clearly a lot of issues that she had.  It's

2 a little perplexing to me, but these things I suppose have their

3 own logic.

4    How she -- how her own sort of abuse that she

02:46  5 suffered, how that gets her into the outlet of supporting ISIS

6 online seems to me hard to understand.  I mean, because ISIS is

7 certainly not a place where -- I mean, as far as I understand --

8 I'm not an expert on it, but as far as I understand it's a place

9 where there's not much respect for women.

02:46  10   So then she's arrested in June of 2018, and basically

11 she admits what she did.  And she tells the -- she acknowledges

12 that this conduct occurred during a very low period in her life.

13 And she clearly was mentally ill, lonely, depressed.  Wanted

14 attention.

02:47  15   But it's -- again, you get into this irony.  I can

16 understand all that and wanting attention, but then why -- why

17 she chooses ISIS, supporting ISIS as an outlet for getting

18 attention from men online?

19   So there are some things about this case that are

02:47  20 really difficult: the absence of much precedent; the fact that

21 it's a really bad offense.

22   But a defendant who is 48 years old and has never had

23 any kind of criminal record and has been the subject of abuse

24 and in some ways is somewhat sympathetic.  Going to be deported

02:48  25 to the Middle East where she hasn't been or lived in three

26

1    decades.  No previous radical ties or conduct.  Her children

2    describe her as a kind, gentle, and caring person who didn't

3    hurt anybody.  The medication does seem to have helped her.

4         The guidelines -- I think the range of the guidelines

02:49  5    is extraordinarily high.  The range is high because of guideline

6    3A1.4, which requires that in cases related to terrorism the

7    offense level be increased by 12.  And if the resulting level is

8    less than 32, then it be increased to 32.

9         So here the offense level is increased from 26 to 38.

02:49  10   And then the guideline also provides that the criminal history

11   category be deemed the highest there can be, VI, regardless of

12   the defendant's actual prior record.

13        So this means that a defendant in a case like this

14   faces a guideline range way in excess of the statutory maximum

02:50  15   regardless of what she actually did and regardless of whether

16   she has any prior record or she has a terrible prior record.

17        You know, in this sense 3A1.4 represents -- or

18   resembles the child pornography guideline which has been roundly

19   criticized by the courts in that it recommends sentences near or

02:50  20   above the maximum even in mine-run cases.

21        So this is totally contrary to the purposes of

22   sentencing in Section 3553(a), including the notion that

23   sentences should be individualized and proportionate, and that

24   we should distinguish between the worst offenders and those who

02:50  25   are less dangerous.

27

1        See *U.S. vs. Dorvee*, D-O-R-V-E-E, 616 F.3d at 186-87.

2        And this aspect of the guideline is also contrary to

3   the whole theory behind the guidelines, which is that the

4   offense level will reflect the seriousness of the offense and

02:51   5   will increase incrementally based on specific aggravating facts;

6   and, that the criminal history category will reflect the risk to

7   the public given the defendant's prior record.

8        As Judge Charles Bryer has noted, the terrorism

9   enhancement "takes a wrecking ball" to this whole idea.

02:51  10        See *U.S. vs. Alhaggagi*, 372 F.Supp. At 1013.

11        Terrorism cases are no doubt serious, but

12   automatically increasing a defendant's criminal history to

13   reflect the seriousness of the charged offense does seem

14   misguided according to Judge Breyer.  That's at page 1014 of his

02:51  15   opinion.

16        Further, as Judge Kane of Denver has noted in

17   discussing the same guideline, "Material support cases," which

18   is what this is, "can involve a wide range of conduct."

19        You can go and -- you can go to the Middle East and

02:52  20   directly help ISIS, or you can be online here and communicate

21   with people.  Yet this 3A1.4 guideline frequently results in

22   guideline ranges that equal or exceed the maximum sentence

23   without differentiating between any kinds of different levels of

24   conduct.

02:52  25        See *U.S. vs. Jumaev*, J-U-M-A-E-V, 2018 U.S. District

28

1    Lexus 119916 at pages 28 and 29.

2            And this is unlike the approach otherwise applicable

3    under Guideline 2M5.3 which includes enhancements based on the

4    type of assistance provided and the impact of any completed

5    acts.

6            So here we have no -- as far as we know there is no

7    impact of any completed acts, at least in the sense that some

8    victim was harmed by it.  And the type of assistance provided is

9    certainly different than in many of these cases that have

10   been -- that are reported.

11           Finally, as both Judge Breyer and Judge Kane noted,

12   the guideline was enacted pursuant to a congressional directive

13   and absent any empirical evidence.

14           See *Alhaggagi* at 1014 and 15.

15           That is, Congress ordered the Commission to enhance

16   this guideline in this way, and guidelines that are created in

17   that fashion do not exemplify the Commission's exercise of its

18   characteristic institutional role --

19           See *Kimbrough vs. U.S.*, 552 U.S. at 109.

20           -- and, therefore, are generally entitled to less

21   respect.

22           See *U.S. vs. Reyes Hernandez*, 624 F.3d at 418.

23           So the guidelines here really are -- provide very

24   limited -- very limited guidance.  And I don't know if I need to

25   say anything more on that.

1      I mean, I suppose you could just sum up a few things:

2           In this case the defendant did not attempt to purchase

3  any weapons;

4           she had no known contact with any members of ISIS;

02:55  5           she did not associate with terrorists, or try to

6  support them while in the armed forces or in law enforcement;

7           she didn't buy a ticket to travel anywhere;

8           she didn't take pictures of any monuments to encourage

9  an attack;

02:55  10          she didn't serve any leadership role of any

11  organization;

12          and she didn't solicit funds from people or attempt to

13  recruit them.

14          And, so, I mean, I'm not -- I'm not at all minimizing

02:56  15  the defendant's conduct:

16          This was a very serious offense;

17          she appeared to be dedicated to ISIS;

18          and she -- she said some things that -- on the

19  internet that were extremely destructive and harmful and could

02:56  20  have the potential of leading to even greater harm.

21          So, and ISIS was engaging in horrific conduct and the

22  defendant was aware of this.

23          And she was a prolific online promoter of ISIS.

24          And she provided information how to commit terrorist

02:56  25  attacks.

30

1        And, as indicated in the report from the government's

2   witness, this Dr. Vidino, this kind of propaganda is a part of

3   ISIS's recruitment and radicalization strategy.

4        And she did -- she wasn't just a sympathizer or a

5   passive follower, but she did promote ISIS very aggressively.

6   And they call her -- this is -- she played this so-called *travel*

7   *agent* role, or *devil on a shoulder* that is encouraging the

8   so-called lone wolves.

9        So even though I think the guidelines in this case are

10  very flawed, that's not meant to suggest that this was not a

11  very serious offense.

12       So, and she was also, as I said, an accomplished

13  hacker and identity thief.

14       And the government's memo on pages 6 through 8

15  includes a fairly lengthy list of the followers that she had who

16  wanted information about committing attacks.

17       So I do agree, though, that Mr. Campion's suggestion

18  that I think there's a kind of a reflexive recommendation on the

19  part of the government in these kinds of cases of always sort of

20  recommending the max without looking at all the specific

21  details.  And that is because it's a serious offense.  And

22  that's I think the flaw in the guidelines, too.  They just say

23  this is a really very serious offense and, therefore, we're

24  gonna recommend the max in just about every case.

25       And it is a very serious offense.  But there still

1    should be -- the whole theory of the guidelines is there should

2    be distinctions between levels of activity.

3         In fact, this really is not a dispute about what the

4    defendant did; it seems that the greater mystery is why.  And

02:59  5    defendant states that she was depressed and mentally ill and

6    that she convinced herself that none of the people she

7    communicated with would actually do anything.  But that -- it's

8    hard to fully grasp that because this clearly was not something

9    that was communicated in any sense of -- that it was not serious

02:59  10   or that she was in any way holding back.

11        You know, that's why I say, the government indicates

12   that it's hard to square her conduct with boredom or fooling

13   around.  She was -- there's no suggestion of that in any of the

14   communications she made.

03:00  15        And I've carefully reviewed the report from Dr. Hanusa

16   for why the defendant may have engaged in this behavior.

17   Dr. Hanusa performed detailed testing.  He noted severe

18   depression and pretrial -- or, I'm sorry, posttraumatic distress

19   symptoms linked to abuse over the course of her lifetime.  She

03:00  20   has a strong tendency to present herself in a way that attempts

21   to gain a favorable impression on others consistent with

22   profiles of battered women.  She also endorsed obsessive

23   compulsive symptoms.

24        The doctor on testing for the presence of psychopathy,

03:01  25   indicated that there was evidence of pathology, manipulation,

32

1  impulsivity.  And her test scores, that is, the defendant's test

2  scores, indicate significant trauma.

3      Dr. Hanusa states:  "The importance of this data is

4  that defendant's behaviors and conduct have been impacted by

03:01   5  that trauma which has in turn impacted her personality,

6  emotional stability and decision-making.  This is a difficult

7  case with many layers of complexity as reflected in the results

8  of the psychometric tests utilized here."

9      Oh, and I think I misspoke when I earlier said that

03:02  10  there was no evidence of recruitment.  I think that was a

11  mistake.  The defendant was involved in recruitment, although

12  it's not clear how successful that was.

13      Dr. Hanusa diagnosed major depression, posttraumatic

14  stress syndrome, obsessive compulsive disorder and generalized

03:02  15  anxiety disorder.

16      In describing the offense, defendant told the doctor

17  that she knew -- or that she did some stupid things, she was

18  talking to the wrong kind of people, she wanted attention, and

19  didn't know at first that people would take her seriously.  She

03:02  20  wanted people to think that she was smart and cool and she liked

21  the attention.

22      In his conclusions Dr. Hanusa indicates that

23  defendant's high levels of OCD symptoms suggest that "she may

24  have issues with impulsivity along with risky decision-making

03:03  25  and biased probabilistic reasoning."

33

1    He indicates that "dysregulated lonely individuals

2  struggle to make themselves feel better, which appears to be the

3  cause here."

4    Dr. Hanusa concludes that rather than prison, "it is

03:03   5  recommended that defendant be given an outcome that will allow

6  her to be maintained in the community adhering to a plan that

7  includes psychotherapy and intensive community supervision."

8    I don't think that there is a need for a sentence at

9  the maximum or near the maximum here.  Such sentence should be

03:03  10  reserved for the worst offenders, and it's hard to see how the

11  defendant falls into this category.

12    She provided information only, not weapons or funds.

13  And there's no proof that anyone used her information to carry

14  out an actual attack.  And she also has no prior record.

03:04  15    Given her age and lack of prior record, the research

16  would suggest that she poses a very low risk of reoffending.

17    See *United States Sentencing Commission, The Effects*

18  *of Aging on Recidivism Among Federal Defenders,* at page 25.

19    And the doctor's testing suggests the same.

03:04  20    While I don't accept the defendant's history of abuse

21  and mental health issues as an excuse for her conduct, I won't

22  ignore them.  With mental health treatment she will hopefully be

23  able to overcome the pathologies that caused her to seek this

24  kind of attention.

03:04  25    Given her history and statements and the statements of

34

1    her family, I do not see her as a hardened jihadist who can't be

2    reformed and thus must be separated from the public for most of

3    the rest of her life.

4           That said, I think that the defendant's requested

03:05   5    sentence is not sufficient.  The conduct here was very dangerous

6    and it went on for a long period of time.  Even if she was

7    motivated by a desire for attention rather than maliciousness,

8    and even if she did have serious mental health issues, I also --

9    I need to promote respect for the law and I need to impose a

03:05   10   sentence that provides deterrence for others.

11          And under all the circumstances I find a sentence of

12   90 months sufficient but not greater than necessary to satisfy

13   the purposes of sentencing.  This sentence is based on 3553(a),

14   and would be the same regardless of the guidelines.

03:05   15          Therefore, defendant is committed to the custody of

16   the Bureau of Prisons for 90 months.

17          Is there a request for a prison recommendation?

18          MR. CAMPION:  Given her non-citizenship status I don't

19   believe that has any impact, but it would be as close to here as

03:06   20   possible.

21          THE COURT:  So ordered.

22          I'm not going to impose any fine.

23          I will impose 3 years of supervised release.  Statute

24   permits supervision up to life, but that's not necessary.

03:06   25   There's a good chance she'll be deported and thus not available

1    for any supervision.

2            Second, she doesn't have a prior record so I don't see

3    her as posing the degree of risk that would call for supervision

4    of that length, particularly after serving the prison sentence.

03:06    5            This term will also suffice to address her mental

6    health needs.

7            I do agree with the government that a computer

8    monitoring condition is warranted given the nature of the

9    offense which involved hacking and extensive online activity and

03:06    10    the need to monitor her computer use for public protection and

11    to deter further activity of the sort involved in this case.

12            A monitoring condition as opposed to a limitation or

13    ban on computer use involves no greater deprivation of liberty

14    than is reasonably necessary for the purposes of 3553(a)(2)(B)

03:07    15    and (C).

16            While she's on release she can't commit any crimes.

17            Can't illegally possess or use any controlled

18    substance.  I find a low risk of substance abuse so I'm going to

19    waive testing.

03:07    20            From the PSR she has to comply with conditions 1

21    through 14, with any payments conditioned on ability to pay.

22            And to -- she can't possess or use a computer as

23    defined in 18 U.S.C. § 1030(e)(1) at any location including

24    employment without prior notice to the supervising probation

03:07    25    officer.

36

1    She has to allow the probation officer to install

2    computer monitoring software on any computer as defined in

3    18 U.S.C. § 1030(e)(1) to ensure compliance with the computer

4    monitoring provision.

03:08    5    She must allow the probation officer to conduct

6    initial and periodic unannounced searches of any computers

7    subject to computer monitoring.

8    Special assessment's a hundred dollars due immediately

9    in Room 362.

03:08    10    Defendant has a right to appeal if she thinks there's

11    something unlawful.  Counsel has a duty to advise her of her

12    rights.  Any notice of appeal has to be filed within 14 days of

13    the entry of judgment.  If defendant wants to appeal and can't

14    afford to, she can ask for leave to appeal as a poor person.

03:08    15    I'll dismiss Count 2.

16    And I wish the defendant the best.

17    (Proceedings concluded at 3:08 p.m.)

18    *    *    *

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

4    Reporter for the United States District Court for the Eastern

5    District of Wisconsin, do hereby certify that the foregoing

6    pages are a true and accurate transcription of my original

7    machine shorthand notes taken in the aforementioned matter to

8    the best of my skill and ability.

9

10   Signed and Certified September 14, 2020.

11   /s/John T. Schindhelm

12   John T. Schindhelm

13

14                    John T. Schindhelm, RPR, RMR, CRR
                      United States Official Reporter
15                    517 E Wisconsin Ave., Rm 324,
                           Milwaukee, WI 53202
16                    Website: WWW.JOHNSCHINDHELM.COM

17

18

19

20

21

22

23

24

25